* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as *Page 2 
 STIPULATIONS
1. The parties are subject to the Workers' Compensation Act.
2. An employment relationship existed between the parties at all relevant times.
3. The employer was self-insured for at all relevant times.
4. Plaintiff's average weekly wage was $691.02 and plaintiff's compensation rate, pursuant to N.C. Gen. Stat. § 97-1, et seq., would be $450.68 as confirmed by the Form 22.
5. Plaintiff has been out of work since January 20, 2003, and temporary total disability benefits have not been paid for that time, pursuant to Form 61.
6. The adjuster would testify that the last payment was paid in accordance with stipulated Exhibit No. 8 on January 11, 2004.
7. In addition, the parties stipulated into evidence the following:
 a. Indexed packet of medical records and reports.
 b. Packet of personnel records.
 c. Documents from the Social Security Administration.
 d. Defendants' discovery responses.
 e. Plaintiff's discovery responses.
 f. Documents relating to prescription medications.
 g. Form 1A-1.
 h. Medical costs summary list.
 i. Packet of Industrial Commission forms and filings and discovery responses.
 j. Additional medical records submitted January 24, 2006.
8. The Pre-Trial Agreement dated November 22, 2005, which was submitted by the parties, is incorporated by reference. *Page 3 
 * * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was sixty-one years old at the time of hearing before the Deputy Commissioner. Although he finished high school, he did so in special education classes. Neither plaintiff nor his wife were good historians. It appeared from the evidence that he had a bad fall when he was two years old and later fell twenty to thirty feet out of a tree when he was seven. After these falls, he experienced speech problems and had difficulty with schoolwork. Plaintiff's teachers noted that he was not capable of regular class work. He also had problems interacting with his peers and was involved in a number of altercations as a teenager and young man. He subsequently enlisted in the Army but was transferred to the Army Reserves, due to hardship, before his enlistment period expired. Medical notes from the Veterans Administration Hospital from 1969 indicated that he had peculiar speech and was very "simple-minded," however, he was found to be competent to handle funds.
2. In December 1986 plaintiff was treated for neck pain by Dr. Weiss, who noted that he had hit his head very hard on the door frame of the car when involved in a motor vehicle accident. In April 1991 he was severely beaten by his son-in-law and two other assailants who kicked him in the mouth with steel-toed boots. Following the assault, he was admitted to the hospital where Dr. Schulhof treated him for a concussion, a plastic surgeon repaired a lip laceration and another specialist apparently treated him for dental injuries. A month after the assault, Dr. Schulhof noted that plaintiff appeared to have neuropsychological problems, with inappropriate behavior and memory problems which were severe enough that he should not be *Page 4 
supervising his small child. The doctor ordered neuropsychological testing, but plaintiff did not attend the appointment scheduled for the testing. Dr. Schulhof then released him from care when plaintiff's daughter indicated that plaintiff was back to his normal cognitive function.
3. Prior to 1993, plaintiff worked for a textile mill, as a truck driver, as a farm worker and as a janitor. In early 1993, he began working through a temporary employment agency at the plant of defendant-employer, a company that manufactured office furniture. His primary job was cleaning the facility, but he also learned to do touch-up, to scuff and sealer sand, to clean drawers and to change blocks. The company hired him as a full time employee in September 1994. Over the years, he learned how to perform other tasks. His supervisors gave him good performance reviews and found his work to be quite satisfactory. His attendance was outstanding.
4. On December 1, 2000 plaintiff climbed up onto a conveyor in the plant in order to address a problem with one of the units riding on it. The conveyor was stopped at that time. However, his feet went out from under him and he fell to the floor when another employee apparently restarted the conveyor. As a result of the fall, he injured his head, neck, back and left knee. An ambulance was summoned. Plaintiff denied having lost consciousness from the fall to the emergency medical technician and to Dr. Krupnick once he arrived at the emergency room. On examination, he had a small contusion over his right forehead and his left knee was very tender, although it did not appear swollen. The doctor ordered x-rays, which proved to be negative. He then diagnosed contusion and strain, and prescribed Motrin.
5. It appeared from the evidence that plaintiff did not return to work for several days after his injury. On December 5, 2000, he reported to the company doctor, Dr. Bate, who examined him and found no evidence of residual problems from the fall. Consequently, the doctor released him to return to work without restrictions on that date. *Page 5 
6. Plaintiff received no medical treatment or evaluations specifically for his fall at work after that evaluation by Dr. Bate. He subsequently did not show up for an appointment with Dr. Bate on an unknown date in 2001 (since there was a hole punched through the month on the report), but he went to the doctor on August 21, 2001, for an ear infection. However, plaintiff also mentioned at that appointment that, since a few weeks after his fall at work, he had been having periodic headaches which were accompanied by fatigue but resolved rapidly. Plaintiff denied other symptoms. Dr. Bate prescribed medication for him at that time.
7. In January 2002, plaintiff was treated at the emergency room for an earache. In August 2002 he was treated by Dr. Bate in the plant medical department for another ear infection. During none of these visits did he mention any problems with his memory. However, on October 25, 2002, plaintiff went to Dr. Bate and stated that he had been having worsening problems with his memory since the time he was severely beaten twelve to thirteen years prior. Dr. Bate referred plaintiff to Dr. Armstrong, a neurologist, who examined him on November 1, 2002. At that appointment, plaintiff and his wife advised the doctor that he had had multiple head traumas, including the fall at work, which they incorrectly indicated had occurred in October 2001, and that he was having trouble remembering appointments and what his wife had told him, as well as getting lost while driving and doing his job.
8. On examination, there were no neurological deficits. Dr. Armstrong ordered various tests to determine the nature of the problem, including an MRI of the head and a neuropsychological evaluation. Dr. Hill, a neuropsychologist, then evaluated plaintiff on November 19, 2002. He also interviewed plaintiff's wife, brother, and sister-in-law, since there were issues relating to memory. Dr. Hill noted that the histories given by family members were sometimes contradictory. In any event, plaintiff had experienced numerous head traumas, the *Page 6 
most significant of which appeared to be the assault in 1991 and, according to plaintiff and his wife, the fall at work in "October 2001."
9. Dr. Hill performed a battery of tests. Plaintiff scored low average on tests for attention and concentration, and his performance on motor and sensory assessments suggested some compromise of the left cerebral hemisphere. Language assessments showed mild longstanding weakness. His memory skills tested to be intact. Intelligence testing resulted in a full scale IQ of 95, which was in the average range, but his verbal scores were significantly lower than his scores on the performance scales, which suggested left hemisphere dysfunction.
10. Overall, the testing did not indicate specific signs of anterior brain damage. In addition, plaintiff's performance was variable and appeared to reflect the cumulative effect of prior injuries and developmental delays with relative dysfunction of the left cerebral hemisphere. The bad fall he had had as a child with the resulting speech and language impairment, in Dr. Hill's opinion, could account for his subsequent problems in school and his current profile. Based upon the information provided, it appeared to Dr. Hill that the injury at work likely exacerbated the underlying cognitive impairments. However, Dr. Hill did not have access to the medical reports from the work-related fall and was only relying on what he was told.
11. Plaintiff then returned to Dr. Armstrong on November 17, 2002. The doctor reviewed the MRI, which was within normal limits, and Dr. Hill's report. He prescribed an anti-depressant, since Dr. Hill had found an element of depression in plaintiff's evaluation, but did not express an opinion regarding plaintiff's ability to work at that time. Rather, Dr. Armstrong left that decision to Dr. Bate.
12. Plaintiff did not see Dr. Armstrong again for several months and apparently did not go to Dr. Bate in December for an opinion regarding his ability to work; however, on January 17, *Page 7 
2003, plaintiff went to Dr. Bate and advised that he had been told two weeks previously that he should be on permanent disability due to brain damage. That was his last date of work. He applied for short-term disability benefits and asked Dr. Armstrong to complete the medical section of the application. At that time, Dr. Armstrong indicated that plaintiff was disabled, but that his condition was not job-related.
13. Plaintiff continued working in his regular job until January 17, 2003. He received good performance reviews through his last review in December 2002. The final review indicated that he had had "coaching" on one occasion for areas missed while sanding. Otherwise, his reviews had shown no problems with the quality or workmanship of his work.
14. Plaintiff and his wife have alleged that he began showing problems with memory immediately after his fall at work and that Mrs. Davis began calling the plant within several weeks of his fall asking that he be sent to a doctor. However, these allegations are not supported by the evidence of record. Neither plaintiff nor his wife were good historians. Moreover, the testimony of Judy Grobe, who no longer works for defendant-employer, and of Vickie Featherstone do not corroborate the testimony of plaintiff and his wife.
15. The Full Commission finds that on December 1, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment. The fact that he fell off of a conveyor constituted an unusual occurrence which interrupted his regular work routine. The conveyor was two to three feet high and plaintiff was six feet tall. As a result of the fall, he sustained contusions and strains to his right forehead, his neck, his back and his left knee, and he was treated at the hospital for his injuries. As of December 5, 2000, when he saw Dr. Bate, plaintiff was not reporting further problems associated with the injury and he returned to work at his regular job. By no later than January 11, 2001, defendants paid for the medical treatment he *Page 8 
received. However, they did not file a Form 60 or other admission of liability with the Industrial Commission.
16. Contrary to the testimony of Mrs. Davis, plaintiff had access to the medical department at the plant and could receive treatment there if he desired in accordance with certain company procedures. In fact, he went to Dr. Bate there in August 2001. However, he did not complain of problems with his memory at that time, although he did mention headaches. He missed another appointment that had been scheduled for him with Dr. Bate that year for unknown reasons. In 2002 he received treatment for ear infections, but again did not mention problems with memory.
17. Mrs. Davis testified that she repeatedly called Vickie Featherstone, the company's human resources manager, and Judy Grobe, the benefits coordinator, to ask them to send plaintiff to a doctor because his memory was getting bad. Mrs. Davis asked them if treatment could be covered by workers' compensation and testified that they told her such treatment would not fall under workers' compensation. Neither Ms. Featherstone nor Ms. Grobe had any memory of such a conversation. Furthermore, neither Ms. Featherstone nor Ms. Grobe handled the plant's workers' compensation claims; the medical department handled those claims.
18. Ms. Grobe did assist plaintiff with his short-term disability and long-term disability claims. She also discussed those claims with Mrs. Davis. However, they did not discuss anything related to the January 1, 2005 fall at work. By the time plaintiff filed for short-and long-term disability, it was clear that he was having cognitive problems, and Mrs. Davis probably did describe some of his difficulties to Ms. Grobe. However, neither she nor plaintiff asked Ms. Grobe about filing a workers' compensation claim. Ms. Grobe did not learn about plaintiff's fall *Page 9 
at work until he was receiving long-term disability benefits, which would have been during the latter half of 2003.
19. Ms. Featherstone also spoke to Mrs. Davis in 2003 about problems with the short-and long-term disability claims, but she had no memory of discussing anything relative to a workers' compensation claim.
20. In any event, if either Ms. Grobe or Ms. Featherstone made comments to Mrs. Davis about a workers' compensation claim, those comments would have been made more than two years after the last payment of medical bills for the injury. Furthermore, even if Mrs. Davis's testimony were true, neither Ms. Grobe nor Ms. Featherstone made any statements to her that could reasonably be construed to indicate that the company would take care of filing or paying a workers' claim from the injury in question. Rather, according to her testimony, they would have agreed to schedule a doctor's appointment for plaintiff or they would have indicated that the claim was not compensable.
21. Plaintiff did not file a claim with the Industrial Commission until February 20, 2004, which was over three years after his fall at work. Although he had cognitive problems since childhood, he had never been declared incompetent as of the date of hearing before the Deputy Commissioner. In fact, he had worked successfully in a number of jobs and had raised and supported a family. As of November 19, 2002, when plaintiff was evaluated by Dr. Hill, his intelligence was measured to be in the average range. He continued working in his regular job with a very satisfactory work performance until January 2003. Thus, based on the totality of the evidence of record, the Full Commission finds that plaintiff has not shown himself to be mentally incompetent. *Page 10 
22. The greater weight of the evidence does not establish that agents of defendants made any statements to plaintiff or to his wife relative to defendants filing or paying a workers' compensation claim for the injury in question. Even if the testimony of Mrs. Davis was found to be completely factual, the statements she claimed were made would not reasonably mislead one into believing that defendants would be filing, paying, or otherwise taking care of a workers' compensation claim on plaintiff's behalf. Rather, the alleged statements would have indicated that defendants were denying the compensability of any alleged claim, which is the position they have continued to take.
23. Between January 17, 2003, when plaintiff stopped working, and the date of hearing before the Deputy Commissioner on November 30, 2005, plaintiff was treated for other health issues, including coronary blockages and a stroke. Following the stroke, he was hospitalized and then underwent rehabilitation. When he had further psychological evaluation by Dr. Hoogerman on November 15, 2005, his cognitive problems appeared to have worsened.
24. If plaintiff had filed a workers' compensation claim on a timely basis, there would still be an issue as to whether the injury by accident on December 1, 2000, had materially aggravated his preexisting condition. The Full Commission finds that the medical and psychological evidence of record is insufficient to establish that there was, in fact, a material aggravation of plaintiff's preexisting and longstanding cognitive disorder by the fall at work on December 1, 2000. Consequently, even if plaintiff's notice was deemed to be sufficient, no causal relationship has been shown between the injury and the cognitive problems that led to plaintiff's disability.
 * * * * * * * * * * * *Page 11 
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Proper filing of a claim within two years after an accident or within two years of last payment of medical compensation, when no other compensation has been paid and when there has been no legal admission of liability, is a condition precedent to jurisdiction by the Industrial Commission. N.C. Gen. Stat. § 97-24(a); Barham v. Kaiser-Roth HosieryCompany, 15 N.C. App. 519 (1972).
2. The employer's report of the accident to the Industrial Commission does not constitute a claim filed on behalf of the employee, and voluntary payment of medical bills by the employer or carrier is not an admission of liability. Biddix v. Rex Mills, Inc., 237 N.C. 660 (1953).
3. A claimant is not required to file a Form 18, but may file any written document which adequately sets forth the nature of his claim.Cross v. Fieldcrest Mills, Inc., 198 N.C. App. 29 (1973).
4. The Industrial Commission does not have jurisdiction over this claim because it arises from an injury occurring on December 1, 2000, the last medical compensation was paid January 11, 2001, and no claim was filed within two years of the date of injury or within two years of last payment of medical compensation. N.C. Gen. Stat. § 97-24(a).
5. Though equitable estoppel may prevent a party from raising the time limitation of N.C. Gen. Stat. § 97-24 to bar a claim, plaintiff has not shown that defendants should be equitably estopped from asserting a jurisdictional bar to this claim. Belfield v. Weyerhaeuser Co.,77 N.C.App. 332, 337, 335 S.E.2d 44, 47 (1985); see also Parker v.Thompson-Arthur Paving Co., *Page 12 100 N.C.App. 367, 396 S.E.2d 626 (1990). Defendants made no representation to plaintiff that they were pursuing workers' compensation on his behalf, or lulled plaintiff into believing he was being cared for by defendants. Id. Further, even if defendant-employer's agents had told plaintiff or his wife that his injury would not be covered by workers' compensation, as alleged by plaintiff, this representation would not be sufficient to evoke the doctrine of equitable estoppel. See Wall v. Macfield/Unifi, 131 N.C. App. 863,509 S.E.2d 798 (1998).
6. Although N.C. Gen. Stat. § 97-50 provides that "no limitation of time provided in this Article for the giving of notice or making claim . . . shall run against any person who is mentally incompetent . . . ," plaintiff in the present matter has not shown himself to be mentally incompetent. N.C.Gen. Stat. § 97-50. Although plaintiff had cognitive problems since childhood, he had never been declared incompetent as of the date of hearing before the Deputy Commissioner. Moreover, as of November 19, 2002, when he was evaluated by Dr. Hill, his intelligence was measured to be in the average range. Id.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. This claim is hereby DISMISSED for lack of jurisdiction.
2. Each side shall pay its own costs.
This 1st day of February 2007.
 S/__________________ CHRISTOPHER SCOTT COMMISSIONER *Page 13 
CONCURRING:
 S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/ ______________________ THOMAS J. BOLCH COMMISSIONER *Page 1